# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**JAMES BIDDLE,**

      Plaintiff,

vs.                                  No. CIV 07-1197 ACT

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff James Biddle's ("Biddle") Motion to Reverse or Remand the Administrative Agency Decision, filed June 23, 2008. [Doc. 14.]  The Commissioner of Social Security issued a final decision denying benefits, finding that Biddle was not disabled and not entitled either to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI").  The Commissioner filed a response to Biddle's Motion [Doc. 16]; Biddle did not file a reply.  Having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, the Court finds that the motion is not well taken and will be denied.

## I.  PROCEDURAL RECORD

In June 2005,[1] Biddle applied for DIB and SSI, alleging he was disabled from August 1, 2003, due to "blackouts," bilateral hand numbness and pain in his back and knees.  Tr. 60-62, 159-61, 63, 69.  Biddle's applications were denied at the initial and reconsideration level.  Tr. 34-37.  On March 20, 2007, the ALJ conducted a hearing, at which Biddle was represented by counsel.  Tr. 173, 176.  On July 25, 2007, the ALJ issued his decision finding that pursuant to the "grids," Biddle was not disabled.  Tr. 13-19.  Thereafter, Biddle filed a request for review.  On October 2, 2007, the Appeals Council denied Biddle's request for review and upheld the final decision of the ALJ.  Tr. 4.  On November 27, 2007, Biddle filed his Complaint for court review of the ALJ's decision.

Biddle was born on December 22, 1971, and was 35 years old at the time of the ALJ hearing.  Tr. 64, 72, 182.  He has an eighth grade education and never attained his G.E.D.  Tr. 72, 103, 185.  He took special education classes in school.  Tr. 186.  Biddle drove trucks for many years and also has previous work experience as a retail stocker.  Tr. 13, 70, 184-88.  He completed truck driving school in about 1991.  Tr. 73, 187.

## II.  STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then

---

[1]Biddle has since filed new applications for benefits in November 2007 that are still pending.  [Doc. 14, p. 1; Doc. 16, p. 2, n. 2.]

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[8] age, education and past work experience, he is capable of performing other work.[9]

At step five, the ALJ can find that the claimant met his burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  Before applying the grids, the ALJ must first find the following:  "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category."  Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)).  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10]

In this case, the ALJ used the grids in reaching his decision at step five of the analysis and did not utilize a vocational expert.

### III.  STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails

---

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled. Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After carefully reviewing all of the evidence, the ALJ issued a thorough opinion denying Biddle's requests for benefits. Tr. 10, 13-19. The ALJ determined, in part, that Biddle has severe impairments consisting of low back pain and migraine headaches; that none of Biddle's impairments or combination of impairments meet listing criteria; that Biddle's allegations regarding his symptoms and limitations lack credibility; that Biddle has the RFC to perform a full range of medium work[11] but is unable to perform his past relevant work; that he has an eighth grade

---

[11]Medium work requires lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. It also requires standing or walking off and on for about six hours a day. This exertional level requires use of the arms and hands to grasp, hold, and turn objects. 20 C.F.R. §§ 404.1567(c), 416.967(c).

education, work experience as a truck driver and retail stocker and no transferable work skills; and that Biddle is 35 years old. Considering his age, education, past work experience and RFC, the ALJ determined that the grids directed a finding of "not disabled." Tr. 18-19.

On October 2, 2007, the Appeals Council considered new evidence submitted by Biddle but found no basis to review the ALJ's opinion. Tr. 4-7.

## IV.  MEDICAL AND WORK HISTORY

There are very few medical records in the administrative record, and therefore, little objective medical evidence to support Biddle's allegations of disabling limitations. Biddle's record also suffers from many inconsistencies, thereby supporting the ALJ's findings that Biddle's allegations lacked credibility.

On July 20, 2005, Biddle was examined by Dr. John R. Vigil at the request of the SSA. Dr. Vigil's records note that Biddle stated he was in good health until November 1993 when he began to suffer from blackouts. The medical history, as reported by Biddle to Dr. Vigil, also indicates that Biddle worked as a tow truck driver until November 1993, when he was forced to quit because of frequent blackouts. Tr. 126. There are no medical records from 1993, and the onset date of disability in this case is August 2003, at which point, Biddle contends, among other things, that he no longer could work because of blackouts. Tr. 13, 69. It may be that Dr. Vigil inadvertently wrote 1993 as the date when the blackouts began or that Biddle mistakenly provided the date of 1993 instead of 2003. In any event, there is no objective medical evidence demonstrating that Biddle suffered from blackouts that forced him to stop driving trucks.

At the ALJ hearing, Biddle testified that he worked as a truck driver from about December 1990 until August 2003. Tr. 188. In 1991, he completed truck driving school in Texas. Tr. 73.

Biddle stated that migraines were his greatest limitation and that his next biggest problem was back pain.  Tr. 190-91.  He did not provide any testimony about blackouts at the ALJ hearing.

Biddle explained to the ALJ that he lost his driver's license in about 2003, and that his license was removed for failure to make "support payments."  Tr. 184-85.  Biddle also stated at the hearing that he stopped driving because of back pain.  Because he had no income, he was unable to make child support payments and his license was removed.  Tr. 185. Biddle has no current driver's license.[12]  Tr. 184.

Biddle's disability application forms are riddled with inconsistencies.  Biddle stated on his benefit application forms that he had never been married.  He also stated that he had no children under age 18 and none ages 18-19.  Tr. 60, 159.  On other disability forms, Biddle claimed that he stopped working in 2003 because he suffered from blackouts that caused temporary blindness for periods of two to three hours.  Tr. 69.  Biddle also stated he could not drive because of his eyes.  "I don't want to kill someone from me driving."  Tr. 78.

Other records and testimony also demonstrate significant inconsistencies.  He initially stated that he lived with his sister in her household.  Tr. 160.  During an interview with disability services in June 2005, Biddle again stated he lived with his sister.  Tr. 63, 68, 74.  On July 6, 2005, Biddle completed an Adult Function Report in which he indicated he was living with his mother.  Tr. 77. His mother prepared meals for him and shopped for him.  Yet, Dr. Vigil's report of July 20, 2005 shows that Biddle's mother died of cervical cancer when she was 28 years old and that Biddle was living with his sister.  Tr. 127.  On September 10, 2005, Biddle wrote in an Adult Function Report

---

[12]Biddle's statement that he no longer drove or had a current driver's license may be contradicted with a medical record note in November 2006 that indicated Biddle was having problems with his car that were adding to his frustration.  Tr. 143-44.

that his mother had to remind him to take a shower and that his mother cooked for him.  He spent time with his mother and sister.  Tr. 118-120.  On November 15, 2006, when seen by another medical provider, Biddle stated that he lived at home with his wife and his mother.  Tr. 144.  At the ALJ hearing on March 20, 2007, Biddle testified that he lived with his mother and his fiancé, notwithstanding earlier assertions that Biddle primarily remained in his room all day and was unable to socialize.  Tr. 99-100, 194, 198.

Although Biddle asserts that he was disabled from 2003 and filed his benefit applications in 2005, there are no medical records until the end of 2006.  In June 2005, when interviewed by disability services, Biddle was observed as having no problems sitting, standing, walking, using his hands, or writing.  Tr. 65-66.  Nonetheless, Biddle complained in his June 2005 benefit applications that he had frequent blackouts and could not see for two to three hours at a time.  Tr. 69.  He had never been seen by a doctor for any illnesses or limitations that affected his work.  Tr. 71.  He was not taking any medications then and no medical testing had been done.  Tr. 72.   In July 2005, Biddle reported that watching television was his hobby and that he stayed home most of the day.  Tr. 78, 79.  He did not socialize.  He had problems lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, seeing, completing tasks and using his hands.  His back and knees hurt him when he tried to left things.  Tr. 79.

On July 6, 2005, Biddle stated in a Disability Services Vision Screening Report that his eye problems began when he started to see "little dots."  Then his vision went black and he was unable to see.  Biddle reported this happened to him almost five to six times every day.  Tr. 83.  He was not being seen by an eye specialist and had not worn glasses since age 11.

8

At Disability Services' request, Dr. Vigil examined Biddle on July 20, 2005, as there was no objective medical information in the record. Tr. 126. Biddle complained of blackouts, numbness in his hands, back pain and bilateral knee pain. He again stated that he suffered from blackouts about four times a day when he was in a "sleeplike" state for two hours at a time. If believed, Biddle would have been in a "sleeplike" state for about eight hours out of every day. Biddle did not have a primary care physician and was not seeking medical treatment. He did not want to take any medications for fear that the medications might cause a blackout. Biddle claimed to have had surgery in 2004 to repair his right leg that was broken.[13] Tr. 127.

Dr. Vigil observed Biddle to be pleasant and healthy appearing. He was cooperative and sat still throughout the examination. Biddle's affect was normal and appropriate. His manual dexterity was fine. He exhibited a normal station and gate. Biddle could squat and "duck walk;" he could hop and rise from his chair. The range of motion and level of strength were normal in his shoulders, hips, knees, ankles and wrists. His cervical and lumbar spine were normal. Tr. 128-29. Biddle could heel-to-toe walk without difficulty. Regarding the blackouts, Dr. Vigil questioned whether Biddle suffered from a seizure order or narcolepsy or the credibility of his allegations. Tr. 129.

Although Dr. Vigil inserted the incorrect name of the patient near the end of his report, it was clear that he was discussing Biddle's allegations of pain. Dr. Vigil's opinion was that Biddle was "only minimally impaired by bilateral hand numbness and bilateral knee and back pain." Biddle reported he could lift over 50 pounds. According to his history, Biddle could not stand longer than

---

[13]Biddle's attorney argues that he may have had back surgery in 2004. [Doc. 14, p. 3.] However, the record at issue includes a rather nonsensical notation that Biddle had "back surgery to repair broken right leg in November 2004." Tr. 127. There are no medical records to confirm any type of surgery in 2004.

30 minutes at a time, but was able to sit for hours.  There was no functional deficits in overhead reaching and lifting heavy objects.  Tr. 130.

Biddle also reported to Dr. Vigil that he smoked a pack of cigarettes a day and that he had no history of alcohol or illegal drug use.  Tr. 128.

In August 2005, Biddle stated that he had started to see doctors at University of New Mexico.  Tr. 102.  He noted that he had an appointment with UNM financial assistance on September 23, 2005 [Tr. 103], but there is no confirmation of that appointment.  Biddle also claimed that in 2005, he went to the ER because of severe pain and blackouts.  Tr. 107.  In response to a request for UNM medical records for Biddle, UNM stated there were no 2005 visits.  Tr. 124.

As of September 2005, Biddle was taking only ibuprofen and supposedly suffering from a lot of pain.  He felt dizzy and started to see spots when he stood for more than 10 minutes.  He was very upset, frustrated and depressed.  Tr. 95.  In September 2005, Biddle reported that he was suffering from more blackouts nearly every day.  Tr. 109.

The first medical record is dated October 24, 2006.  On that date, Biddle was seen at UNM hospital.  Tr. 154.  He had an MRI of his lumbar spine that showed the disc space and height were normal and that there was a "very mild" diffuse disc bulge at L4-L5 without narrowing.  Basically, the results were normal.  Tr. 148.

In November 2006, Biddle had a CT scan for sinus problems.  Biddle had chronic sinusitis and was a long-time smoker.  Tr. 155.  The CT scan showed he had a left maxillary mucous retention cyst and mild mucosal thickening.  He also had a tooth abscess near his sinuses.  Tr. 155. The specialist recommended some treatment and procedures but Biddle declined any type of surgical treatment.  He was "happy" to know what was going on.  Tr. 141.

10

On November 15, 2006, Biddle was seen by a certified nurse practitioner, Michael Servilla.[14] Tr. 143.  Biddle was following up on his complaints of headaches, chronic lower back pain, pain management, and lipid and thyroid studies.  He continued to experience headaches every day.  He suffered from intermittent left upper jaw tooth pain and sinus pain.  Biddle was prescribed a pain medication, vicodin.  He was using it up prematurely because he was taking more than the amount prescribed.  He denied any weakness, numbness, slurring of speech or loss of vision.  While he had severe dental problems, he could not afford to go to a dentist.  Biddle was attempting to quit smoking.  He reported bilateral hand paresthesias, but the studies were negative for carpal tunnel syndrome.  Tr. 143-44.  Biddle reported that he lived at home with his wife and mother and that he previously worked as a painter.  Tr. 144.

Servilla started Biddle on verapamil to see if it helped with his headaches.[15]  Servilla also noted that Biddle was to begin physical therapy in December and urged him to continue with therapy.  Biddle was referred to neurology for further evaluation.  Tr. 144.

On December 5, 2006, Biddle was seen for an initial evaluation for physical therapy.  Tr. 138.  The medical diagnosis was chronic lower back pain for five years.  His current reported pain level was 7 of 10 while using vicodin.  He again stated that he was a "painter" but could not return

---

[14]Biddle's attorney incorrectly identifies Servilla as a doctor.  [Doc. 14, p. 3.]  Nurse practitioners, like Servilla, are not "acceptable medical sources" under the SSA regulations.  20 C.F.R. § 404.1513(d).  However, their opinions may be entitled to some weight.  "Although SSR 06-03p recognizes the potential value of opinions from medical sources who are not 'acceptable medical sources,' the ruling also points out that it is still necessary to distinguish between 'acceptable medical sources' and other medical sources. This is necessary because '[i]nformation from ... 'other [medical] sources' cannot establish the existence of a medically determinable impairment.' SSR 06-03p, 2006 WL 2329939 at *2. Further, 'only acceptable medical sources can give ... medical opinions' and 'be considered treating sources ... whose medical opinions may be entitled to controlling weight.'" Id. Bowman v. Astrue, 511 F.3d 1270, 1274-75 (10th Cir. 2008).

[15]The November 15, 2006 medical record states that "in the past Neurology has tried relpax and propranolol [for the headaches]; these have been stopped, as they were ineffective."  Tr. 144.  There are no earlier records from Neurology showing treatment.

to his job because he suffered from migraines with back pain. Biddle stated that he had been trying to do some strengthening exercises at his apartment complex and was walking 1-2 miles five times a week. He felt the exercise was helpful but the pain still returned. Biddle reported that he was trying to get disability benefits. Biddle appeared to ambulate slowly and with some stiffness. Tr. 139. He was able to forward bend to the level of his knee with complaints of back tightness. He had full lumbar rotation without complaints of back pain. The therapist discussed the benefits of increased cardiovascular activity and smoking reduction. Biddle demonstrated signs and symptoms of mechanical low back pain, probably exacerbated by inactivity and smoking. The physical therapist was to follow his progress every 1-2 weeks, but there are no other therapy records.

In December 2006, Biddle refilled his prescription for vicodin. He still had not established himself as a patient of a primary care practitioner. In January 2007, Biddle again was allowed to refill his pain medication prescription but was advised to make a follow-up appointment before more refills would be allowed. Tr. 134. Biddle's medication profile, as of February 2007, shows he was taking an anti-depressant, topiramate for migraine prevention, pain medications, including morphine, flunisolide nasal, thyroid medication, atorvastatin for high cholesterol, and verapamil for high blood pressure. Tr. 133.]

On February 28, 2007, Biddle's attorney wrote a letter to the ALJ requesting that a consultative mental exam be conducted based on the fact that Biddle completed only the 8th or 9th grade, never attained a G.E.D., was placed in special education courses during his schooling and was recently prescribed an anti-depressant. Biddle was not under any psychological care. Tr. 28.

On March 20, 2007, at the ALJ hearing, Biddle's attorney again noted her request for a mental consultative exam.  Tr. 180-81.  The ALJ stated he would consider whether the examination was necessary after hearing the evidence.  Tr. 182.

Again, Biddle did not discuss blackouts during the ALJ hearing.  He described migraine headaches and back pain as his biggest physical limitations.  The medication for the migraines was helping to some extent, and it was being increased.  Tr. 193.  He reported that the CT scan of his back showed two discs bulging out; however, the reports indicated a very mild disc problem.  The medication for his back helped him but made him dizzy.  Biddle stated he had occasional numbness in his wrists and that it was hard to grip things.  He was not really walking several miles a day; instead, he walked for several hours but had to rest a lot.  Tr. 193.  Biddle was not able to sleep well and spent most of the day lying on his back and watching TV.  He stretched a little and tried to walk.  He tried to help his mother but his fiancé  helped more than he did.  Biddle was never treated for depression.  He reported that he sometimes felt happy and sometimes felt angry.  The zoloft had helped to some degree.  Tr. 199.

As noted previously, the ALJ's written decision of July 25, 2007, denied an award of benefits to Biddle.  The ALJ thoroughly addressed the few medical records and test results that existed.  He also fully discussed Biddle's testimony at the hearing.  Tr. 16.  The ALJ rejected Biddle's attorney's request for a mental health examination because there was no evidence to indicate mental retardation or significant depression.  Tr. 17.  The ALJ gave Biddle the benefit of the doubt in finding some of the impairments severe, notwithstanding the medical consultant's report.  The ALJ further noted all of Biddle's subjective complaints but found that his allegations were not persuasive or credible.

"While the record reflects little in terms of medical treatment and examination, there is much to indicate poor credibility." Tr. 18.

The ALJ concluded that the credible evidence indicated Biddle had the RFC to perform a full range of medium work. The conclusion was supported by the weight of the medical evidence and Biddle's credible admissions concerning his capabilities. There was no medical source opinion to the contrary. Tr. 18.

Several days after the written decision, nurse practitioner Servilla wrote a letter on behalf of Biddle in which he stated that Biddle was evaluated and treated for multiple medical problems including chronic/progressive lower back pain, weakness of the lower right extremity, recurrent headaches and depression. Servilla wrote that he did not feel Biddle could work in any meaningful way. Tr. 172. According to the medical records, Servilla had examined Biddle on one occasion. The ALJ did not see this letter, but the Appeals Council considered this letter, along with a recent medication profile and Biddle's attorney's letter. Tr. 4, 7, 167, 172. As noted previously, Servilla is not an "acceptable medical source," nor is it his province to make the ultimate determination of disability.

## V.  DISCUSSION

Biddle argues that the Court should remand this matter based on new and material evidence (attached to the briefing) or award immediate benefits to Biddle based on the new and material evidence. Biddle also asserts that the ALJ committed error by failing to develop the record and that the ALJ improperly applied the Grids.

## 1.    NEW AND MATERIAL EVIDENCE

### a.    *Summary of New Evidence*

Attached to his brief, Biddle submitted new medical evidence from 2008 that was obtained subsequent to the ALJ's July 2007 decision and the Appeals Council's October 2007 decision. Thus, the new information was not before the ALJ or the Appeals Council. However, the 2008 information will be presented with the subsequent November 2007 benefits applications that are now pending.

The new evidence consists of: (1) a January 11, 2008 letter from Nurse Practitioner Servilla stating that Biddle suffers from chronic low back pain, recurrent headache pain and depression, and that Servilla does "not feel that Mr. Biddle can seek and maintain gainful employment;" (2) a March 14, 2008 questionnaire, analysis of criteria for affective disorders, and mental residual functional capacity assessment filled out by Dr. Carolyn Lewis at UNM's Psychiatric Center; (3) a March 21, 2008 Disability Determination Examination by Louis Wynne, Pd.D., who examined Biddle in one 2008 session; and (4) a psychological evaluation by David LaCourt, Ph.D., who examined Biddle on May 24, 2008. Disability Services referred Biddle for both psychological evaluations in conjunction with Biddle's second benefits application.

Dr. Lewis started seeing Biddle on January 18, 2008 and diagnosed him with major depressive disorder, hypertension, hyperupidema, chronic back pain, hypothyroidism and migraines. She noted his depressed mood, poor sleep, decreased appetite, and decreased energy and interest. He was taking several anti-depressants and valium. Dr. Lewis determined that Biddle had an affective disorder under § 12.04 (characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome). Dr. Lewis noted that Biddle had had thoughts of suicide but none currently. She found marked limitations in his ability to function socially. She stated that his condition worsened in February 2008.

Dr. Wynne examined Biddle on March 21, 2008.  He noted two extracts from a "47-page clinic note prepared at the Academy clinic of UNM Family Health Clinic, February 12, 2007; and July 27, 2007."  [Doc. 14, Ex. C, p. 1.]  It appears that the "47-page clinic note" of February 12, 2007 would have existed when the ALJ held the hearing in March 2007 and before the July 2007 decision.  However, that 47-page extract is not part of the record, nor is any explanation provided as to why it was not included.

Dr. Wynne observed that Biddle's girlfriend "of 5 years" accompanied Biddle to the examination.  Biddle's hygiene and grooming were marginal and there was body odor.  His affect was flat, congruent with a depressed mood, but he was cooperative.  Biddle stated he had had blackouts under the influence of alcohol and that there was some somnambulism with other apparent alterations in consciousness.  He denied current use of alcohol but drank excessively from ages 18-23, when he had blackouts and "shakes."  He used inhalants during his teens.

Biddle could not copy a pair of intersecting pentagons and could not remember and carry out a written three-part set of directions.  He had other problems with mental status testing and could not perform operations in simple mental arithmetic.  Dr. Wynne estimated his intelligence as below average and that his ability to present a plausible, detailed personal history was impaired.  In this personal history, Biddle stated that he was hit by a car while riding a bicycle at age 8, and hit in the forehead with a baseball at age 13.

He was currently diagnosed with thyroid problems, high blood pressure, high cholesterol, a disc bulge at L4/L5 and fibromyalgia.  He suffered from migraine headaches and tunnel vision. He walked with a cane and was wearing braces on his wrists for numbness.

Biddle discussed having two older children who were living with their mother.  He also had a third child of an unknown age with a woman whose name he did not remember.  Biddle lived with his mother.

Dr. Wynne concluded that Biddle's ability to persist at simple work tasks was severely impaired.  He was assessed with a GAF of 40.

Dr. LaCourt examined Biddle on May 24, 2008.  The issues for referral included depression, migraines and lower back pain.  Biddle lived with his mother.  He lost his driver's license because of child support issues.  He stated he had not worked regularly since an accident in 2003 when he attempted to uncouple a double trailer from his semi, by hand.  He hurt his back at that time although he did not seek medical treatment.  [Doc. 14, Ex. D.]

Biddle arrived for his office visit using a cane and wearing wrist braces on both hands.  He stated he was diagnosed with fibromyalgia but there was no supporting documentation.  He indicated he had not used alcohol for the "past several years."  He smoked three packs of cigarettes per day. Dr. LaCourt provided mental testing and concluded that Biddle was in the moderate range of significantly subaverage or impaired intellectual functioning.  Dr. LaCourt noted he should rule out mild or moderate mental retardation.  He further stated that "it is unlikely that [Biddle] would have been able to perform the reported work in his history if he was then functioning in the moderate range of impairment."  Under alcohol/illicit substance involvement, Dr. LaCourt wrote "none known for about three months as of our visit."

> **b.**      ***Standard for Remand based on New and Material Evidence***

Title 42 U.S.C. § 405(g) provides for judicial review of final decisions of the Commissioner in social security cases.  Section 405(g) specifies what actions the Court may take on review and

allows the district court only limited authority to remand to the agency. One instance when the Court may remand is if "new and material evidence comes to light, and there is good cause for failing to incorporate such evidence in the earlier proceeding." 42 U.S.C. § 405(g). This is known as a "sentence six" remand. Nguyen v. Shalala, 43 F.3d 1400, 1403 (10th Cir. 1994). It is Plaintiff's burden of proof to show that remand is proper under § 405(g). *See* Rhodes v. Barnhart, 117 F. App'x 622, 626, 2004 WL 1966211 (10th Cir. Sept. 7, 2004) (internal citation omitted).

For new and material evidence to warrant a remand, the claimant must show that "the new evidence would have changed the Secretary's decision had it been before him." Hargis v. Sullivan, 945 F.2d 1482, 1493 (10th Cir. 1991). Implicit in this materiality requirement is that the proffered evidence relate to the time period for which the benefits were denied. Id. at 1493. New evidence is not considered if it relates to a "later-acquired disability" or "the subsequent deterioration of the previously nondisabling condition." *See* Beauclair v. Barnhart, 453 F. Supp. 2d 1259, 1269 (D. Kan. 1996) (internal citation omitted). In such cases, the appropriate approach is to initiate a new claim for benefits, as was done in this case by Biddle. *See* Rhodes, 117 F. App'x at 626 (internal citation omitted).

To summarize the requirements, the evidence must be "new" and not merely cumulative; it must be material; i.e., relating to the time period when benefits were denied; it must offer a reasonable possibility of changing the Secretary's decision; and the claimant must show good cause for the failure to obtain and present the evidence at the prior hearing. Id. (internal citations omitted).

### c.    *Analysis of New Evidence*

The letter, dated January 11, 2008, from Nurse Practitioner Servilla is not new evidence. It is cumulative. The Appeals Council already reviewed and rejected a similar letter by Servilla,

written shortly after the ALJ issued his decision.  Moreover, as noted above, Servilla is not an "acceptable medical source" and his opinions do not qualify as "medical opinions."  In addition, the Court concludes that Servilla's second letter does not afford a reasonable possibility of changing the Commissioner's decision, since the first letter, while almost identical, did not convince the Appeals Council to accept review.  Finally, Plaintiff made no showing of good cause for why this kind of evidence could not have been made available earlier.  Plaintiff did not discuss the "good cause" requirement at all.

With respect to Dr. Lewis's mental health examination and results, the medical information is new and discusses in more detail Biddle's diagnosis of major depression along with treatment and limitations.  However, Dr. Lewis notes that she began seeing Biddle in January 2008 and that his condition worsened in February 2008.  Thus, the proffered new evidence does not relate to the time period for which benefits were denied; i.e., between the date of onset, August 2003 and the date of the ALJ's decision in July 2007.  Dr. Lewis did not become Biddle's physician or psychiatrist until 2008, and her reports purport to detail Biddle's condition as they existed in 2008.  Nothing in her report indicates that the testing related back to 2007.  Instead, this new medical information is more appropriately described as "later-acquired disability" or subsequent deterioration of a previously nondisabling condition.

The record clearly demonstrates that Biddle was supposed to be seeing physicians at UNM as early as 2005.  He was seen at UNM in late 2006.  He complained of some depression then but did not seek psychological treatment.  Plaintiff provides no explanation why Biddle was not being treated for depression during the pertinent time frame if his symptoms were as severe then as Dr. Lewis describes them in 2008.  In addition, Plaintiff fails to explain why the "47-page" extract from

19

UNM Academy office was not part of the record or why references to treatment by UNM's neurology department were not supported by medical records.  Biddle once again failed to satisfy his burden in demonstrating there is good cause for failure to provide this type of medical information during the pertinent time frame.

Dr. Wynne's March 21, 2008 examination, testing and results are new medical information. The report indicates that Biddle was using a cane and wearing splints on his wrists.  His hygiene and grooming were marginal and there was body odor.  He admitted on this occasion that the blackouts he complained of earlier were actually the result of alcohol abuse, even though he previously denied any use of alcohol.  His medical history this time included early instances of head trauma, and yet medical examinations from 2006 did not include this type of historical information.  The record states that Biddle's first contact with a mental health professional was "last year" (2007), but no such records were part of this administrative record.

When Biddle was examined in 2005 and 2006, his hygiene and grooming were fine.  He was not wearing splints on this wrists then nor was he using a cane.  He had been able to work for a period of 13 years, notwithstanding the history of early childhood head trauma.  The Court again concludes that this medical information does not relate to the period at issue, and instead is evidence of "later-acquired disability" or subsequent deterioration of a previously nondisabling condition. Thus, it is not material.  Moreover, Plaintiff did not demonstrate good cause for failing to provide the medical information and history that might have prompted more thorough examinations during the pertinent time frame, including Biddle's long-term abuse of alcohol that led to blackouts.

The same is true for David LaCourt's June 2008 psychological evaluation of Biddle.  In this report, Biddle provides yet another explanation for why he stopped working in August 2003; i.e.,

a back injury from an accident.  Biddle was still using a cane and wearing wrist braces.  He was diagnosed with fibromyalgia at this point.  His intellectual testing prompted Dr. LaCourt to seek to rule out moderate mental retardation.  However, Dr. LaCourt noted that if Biddle were functioning in the moderate range of impairment he was exhibiting during 2008 testing, it is unlikely he would have been able to perform the reported work history.  Thus, again the information is not material to the time period in question.  Moreover, Plaintiff failed to show good cause for providing some of the evidence revealed in this testing during the pertinent time frame.

The Court concludes that Plaintiff failed to meet his burden of proof in meeting the requirements for a remand under § 405(g).  Thus, the new information does not warrant a remand and is not considered by this Court in its review of the final decision of the Commissioner.

**2.      DEVELOPMENT OF THE RECORD**

A social security disability hearing is nonadversarial, and the ALJ is responsible for "ensuring that an adequate record is developed during the disability hearing consistent with the issues raised."   Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir.1993).

> The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised. This is true despite the presence of counsel, although the duty is heightened when the claimant is unrepresented. The duty is one of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and learns the claimant's own version of those facts.

Id. (citations, quotations, and brackets omitted).  In addition, if the agency receives inadequate information from a claimant's treating doctor or other medical source to make a disability

21

determination, the agency will need additional information to make its decision.   20 C.F.R. § 404.1512(e).

The ALJ's responsibility to develop the record may require the ALJ to order a consultative examination. *See* Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).  The Commissioner is given broad latitude, however, in making a decision to order such an examination. Diaz v. Sec'y of Health & Human Servs., 898 F.2d 774, 778 (10th Cir.1990). An ALJ's duty to order a consultative exam is triggered upon a showing of objective evidence by the claimant "sufficient to suggest a reasonable possibility that a severe impairment exists." Hawkins, 113 F.3d at 1167.  For example, where there is a direct conflict in the medical evidence requiring resolution or where the medical evidence in the record is inconclusive, a consultative examination is often required.  Hawkins, 113 F.3d at 1166.

Here, Biddle argues that the ALJ failed to develop the record by denying counsel's request for a consultative mental examination.  Counsel's request for consultative examination asked that the evaluation include IQ testing and a mental status exam.  Tr. 28.  Counsel explained at the ALJ hearing that such an exam was necessary based on Biddle's eighth grade education, attendance in special education courses and recent prescription of zoloft, an anti-depressant, in late 2006.

The ALJ carefully considered the request and decided he would re-evaluate the need for a consultative mental status exam after reviewing the evidence at the hearing.  In his written decision, the ALJ expressly found that there was no evidence to indicate mental retardation or significant depression. Tr. 17.  The ALJ further  observed that Biddle admitted he was able to read and write and count at least small amounts of change.  He passed a written examination to obtain a truck driving license and was able to work for years as a truck driver and for some period of time as a

retail stocker.  The ALJ noted that Biddle had not sought specialized mental health treatment and that his depression appeared to be mild situational depression at most.  *See* <u>Walker v. Shalala</u>, 993 F.2d 630, 631-32 (8th Cir. 1993) (ALJ may consider the lack of ongoing medical treatment to be inconsistent with complaints of a disabling condition.)

In addition, the ALJ relied upon the consultative physician's determination that Biddle's mental status was normal.  The ALJ further noted that Dr. Vigil had found Biddle's affect, speech, behavior and cognitive functioning were all normal or appropriate.  Tr. 15. On November 15, 2006, when seen by the nurse practitioner, the record indicates Biddle was "in no apparent distress" and that he was coherent and clear.  [Tr. 16, 144.]

At the ALJ hearing, upon questioning by counsel, Biddle testified that he felt both happy and angry at times.  He also stated he felt sad all of the time.  Tr. 198-99.  Finally, he testified that he had differing emotions ranging from happy to sad and that the Zoloft was helping him some.  Tr. 199. Nothing in the record before the ALJ indicated that Biddle had a serious depression problem or that he was unable to function.  Indeed, Biddle worked as a truck driver for approximately 13 years and claimed to have been a painter for some period of time.  This is not a case where Biddle provided objective evidence suggesting a reasonable possibility that a severe impairment of depression existed during the time period in question.  Nor is this a case where there was a conflict in the record that needed resolution.  Thus, the ALJ committed no error and properly concluded, based on the record before him, that there was no indication of the existence of severe mental impairments sufficient to require a consultative mental examination.   Although Biddle's attorney argues that new and material evidence attached to his brief indicates Biddle suffered from disabling depression, the Court does not consider information that was not before the ALJ.  Pursuant to the jurisdiction conferred

upon the Court by the Social Security Act, the Court enters judgment based only on the pleadings and the record before the Commissioner.  42 U.S.C. § 405(g).  The Court does not consider "new" evidence offered for the first time to this Court except to determine whether remand is necessary to the Commissioner so that the Commissioner must consider the new evidence.  Selman v. Califano, 619 F.2d 881, 885 (10th Cir. 1980).  As noted above, the Court has determined that remand is not warranted.

**3.      USE OF GRIDS**

Biddle argues that the ALJ erred in applying the grids in a case where the primary impairments were nonexertional; i.e., pain from migraine headaches, along with dizziness and blackouts, and numbness in his hands.  In addition, Plaintiff again attempts to rely on the new evidence attached to his brief.  However, as stated above, the Court declines to consider the 2008 medical evidence.

The grids consider only exertional or strength impairments.  Hargis, 945 F.2d at 1490; Trimiar, 966 F.2d 1326, 1333 n.2 (10th Cir. 1992).  Exclusive resort to the grids is inappropriate when evaluating nonexertional limitations such as pain.  *See* Thompson, 987 F.2d at 1488 (it is well established in the Tenth Circuit that resort to the grids is particularly inappropriate when evaluating nonexertional limitations such as pain).  Under circumstances where there are nonexertional limitations, a vocational expert must be consulted to determine whether a significant number of jobs is available in the national/regional economies that the claimant can perform despite the impairments.  Cruse v. U.S. Dept. of HHS, 49 F.3d 614, 619 (10th Cir. 1995).

However, "[t]he mere presence of a nonexertional [pain] impairment does not preclude reliance on the grids."  Thompson, 987 F.2d at 1488.  The pain must interfere with the ability to

work.  Thus, "an ALJ may not rely conclusively on the grids unless he finds . . . that the claimant has no significant nonexertional impairment," and the finding must be supported by substantial evidence.  Id.

Here, the ALJ determined at step two that Biddle's hand numbness was not severe as the consultative physician indicated minimal impairment associated with Biddle's subjective complaint. Tr. 17.  In addition, the ALJ relied on later test results showing a normal EMG study of the upper extremities.  During the time period at issue, Biddle received very little medical treatment for numbness in his hands.  Moreover, when he complained of it in 2005, he did not seek any medical treatment and exhibited normal manual dexterity upon examination.  Tr. 128.

The ALJ determined at step two that the medical evidence established severe impairments of low back pain "with mild abnormal findings on MRI," and a history of migraine headaches.  Tr. 17.  However, the ALJ found Biddle's allegations concerning his symptoms and related functional limitations only partially credible.  Tr. 18.  The ALJ observed that some of the symptoms were supported by Biddle's medically determinable conditions, but the weight of the evidence did not support the kind of limitations subjectively alleged.  Instead, the objective medical evidence indicated "very mild" degenerative changes in the spine, and the MRI was essentially normal.  Tr. 148, 154. There was no radiological or clinical evidence of neurological involvement, and Biddle exhibited normal range of motion and strength.  Tr. 18.

Again, while Biddle complained of back problems and pain starting as early as 2003, he sought no medical treatment for his condition for years, until late 2006.  Generally, he was taking only Ibuprofen or Tylenol for his pain until November 2006.  Tr. 111, 116.  In addition, while Biddle was referred to neurology in November 2006 and for physical therapy for his back in December

2006, there are no corresponding medical records to confirm that he received neurological treatment or that he continued therapy past his initial visit on December 5, 2006.

In July 2005, Biddle stated he could lift over 50 pounds.  The examining physician noted no functional deficits in Biddle's ability to lift and reach for heavy objects.  Moreover, as late as December 2006, Biddle told the physical therapist that he was walking one to two miles five times a week, during the same time he alleged pain ranging from 7 to 10 on a scale of 1 to 10.  Tr. 18.  Biddle was also doing some strengthening exercises at home.  The therapist concluded that Biddle exhibited signs of mechanical low back pain probably exacerbated by inactivity and smoking.

With respect to migraine headaches, the ALJ stated that the evidence did not support Biddle's allegation of severity and frequency, such that would preclude him from sustaining work on a full-time basis.  Tr. 18.  The ALJ also noted that the record indicated little medical treatment for the condition and significant room to doubt Biddle's credibility.  For example, Biddle testified at the ALJ hearing in July 2007 that he was currently suffering from at least four blackouts a day that lasted two hours at a time.  In other words, Biddle had blackouts every day for about eight hours, and yet he was not seeking treatment or taking medications.  Biddle admitted that the medications for pain and migraines were helping him to some extent.

The Court concludes that substantial evidence supports the ALJ's credibility determinations and his finding that Biddle did not have any significant nonexertional impairments with respect to numbness and pain.  This is not a case where the ALJ challenged only the claimant's credibility with respect to allegations of pain.  Instead, the ALJ clearly stated that Biddle's impairments would not preclude him from sustaining work on a full-time basis.  Tr. 18.  Moreover, during the majority of the pertinent time period, Biddle neither sought nor received medical treatment for pain.  Because

there was insufficient evidence in the record to support a finding that Biddle suffered from a significant pain impairment during the pertinent time frame, the ALJ's use of the grids was appropriate.[16]

Stated differently, substantial evidence in the record supports the ALJ's finding that Biddle has the RFC for a full range of medium work during the pertinent time frame and that Biddle's RFC for work is not restricted by nonexertional impairments. Moreover, no error occurred concerning the ALJ's failure to obtain vocational testimony.

### VI.  CONCLUSION

For all of the above-stated reasons, the Court determines that James Biddle's Motion to Reverse or Remand is DENIED and that this matter is DISMISSED, with prejudice.

_____
Alan C. Torgerson
United States Magistrate Judge

---

[16] This case is distinguishable from Sandoval v. Barnhart, 197 F. App'x 801, 803 (10th Cir. Oct. 18, 2006), where the court determined that a finding at step two that a claimant's back pain is a severe impairment makes it impossible to conclude at step four that the claimant's pain was insignificant, and that, therefore, it was error for the ALJ to have relied conclusively on the grids at step five.  In Sandoval, the claimant received significant medical treatment for his condition and pain.  His primary care physician opined that he could not perform certain categories of work, that his back condition was permanent, and that Sandoval was incapacitated by back pain notwithstanding therapy and medication management.  In this case, despite findings of no severe impairment by the state agency medical consultant, virtually no medical treatment, and "very mild" MRI findings, the ALJ gave Biddle the benefit of the doubt at step two.  Tr. 17.  Biddle's history of not seeking medical care for alleged back injuries and pain along with his testimony about lifting 50 pounds and walking 1-2 miles a week contradict the limitations he alleged.